UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANNA STEPP and MICHAEL STEPP, on behalf of M.S., | : | CIVIL NO: 4:12-CV-02290 |
| | : | |
| Plaintiffs | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| THE MIDD-WEST SCHOOL DISTRICT, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM AND ORDER**
February 23, 2015

**I. Introduction.**

The plaintiffs, Deanna and Michael Stepp (parents) on behalf of their son,

M.S., appeal from two decisions of the Due Process Hearing Officer pursuant to the

Individuals with Disabilities Education Act (IDEA).   They also present a claim

under the Rehabilitation Act.   Before the Court is a motion for judgment on the

administrative record filed by the parents and a motion for judgment on the

administrative record and/or summary judgment filed by the defendant, the

Midd-West School District (School District).   After carefully considering the entire

administrative record, we agree with the findings and decisions of the Hearing

Officer.   Accordingly, we will deny the parents' motion and grant the School

District's motion.

## II. Background and Procedural History.

Due to academic and behavior concerns, M.S.'s parents requested that the School District evaluate M.S. to determine whether he was eligible for special education services.[1] The School District completed an initial evaluation report in May of 2011 concluding that M.S. was eligible for special education services, and it found that M.S. was eligible based on "other health impairment."[2]  In June of 2011, the School District issued an Individualized Education Program (IEP), which changed M.S.'s placement to a different elementary school that purportedly would provide better access to behavior and math support services.   The parents approved the IEP.   The School District issued a second IEP on October 11, 2011, which the parents also approved.   The School District then completed a functional behavior assessment of M.S. and drafted a positive behavior support plan dated December 15, 2011.   The parents approved the positive behavior support plan.

---

[1] The facts set forth in this paragraph and the next are based on facts that the parties stipulated to during the administrative due process proceedings.   In later sections of this Memorandum and Order, we set forth the facts found by the Hearing Officer based on the testimony at the two administrative due process hearings.

[2] The initial evaluation report notes that M.S.'s mother informed the School District that M.S. was diagnosed with Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and anxiety. *Doc. 31-3* at 2.

M.S.'s parents had him evaluated by a clinical neuropsychologist, Dr. Dowell, who diagnosed M.S. with a nonverbal learning disability.   The parents provided Dr. Dowell's January 5, 2012 report to the School District and requested that the School District conduct a reevaluation of M.S.   The School District agreed to a reevaluation, but it rejected the parents' request for an IEP meeting in February of 2012.   The School District conducted a reevaluation of M.S., and it issued a reevaluation report dated March 23, 2012.   The parents disagreed with the reevaluation report and requested an independent educational evaluation at public expense.

After the parents requested an independent educational evaluation at public expense, the School District filed an administrative due process complaint claiming that an independent educational evaluation was not necessary because, during the past 12 months, it had evaluated and reevaluated M.S. and it was providing multiple supports for M.S.   The parents also later filed an administrative due process complaint claiming that the School District denied M.S. a free appropriate public education (FAPE) and discriminated against him during the 2011-2012 school year. They sought compensatory education for M.S.

Both administrative complaints were decided by the same Hearing Officer, who conducted a hearing as to each complaint.   By a decision dated August 20,

3

2012, the Hearing Officer found that the School District's reevaluation of M.S. was appropriate, and, thus, the School District was not required to pay for an independent educational evaluation.   By a decision dated August 25, 2015, the Hearing Officer found that near the end of the 2011-2012 school year the School District denied M.S. a FAPE by denying M.S.'s mother a meaningful opportunity to participate in the educational process.   But because the denial of a FAPE was limited to the last portion of the school year and resulted in M.S. not receiving social work services as set forth in his IEP, he awarded only four hours of compensatory education to make up for the lost social work services.

On November 18, 2012, the parents began this action—*Stepp v. Midd-West School District,* 4:12-CV-2290 (M.D.Pa.)—by filing a complaint appealing the August 20, 2012 decision of the Hearing Officer finding that M.S. was not eligible for an independent educational evaluation paid for by the School District.   A few days later, the parents began another action—*Stepp v. Mid-West School District*, 4:12-CV-02348 (M.D.Pa.)—appealing the August 25, 2012 decision of the Hearing Officer finding that M.S. is entitled to only four hours of compensatory education for the 2011-2012 school year.   After the School District filed an answer in each case, Judge Brann consolidated the cases under docket number 4:12-CV-2290.   The

parties then consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.

The parties filed motions for judgment on the administrative record, but later, with the consent of the parties, we referred the case to Chief Magistrate Judge Carlson for a settlement conference.   After Judge Carlson reported that the parties settled this case, we issued an order dismissing the case without costs and without prejudice to the right of either party, upon good cause shown, to reinstate the action within 60 days if the settlement is not consummated.   Later, the parties informed the court that the settlement was not consummated, and after a telephone conference with counsel, we reopened the case and set a deadline for the parties to file new motions for judgment on the administrative record.   The School District then filed a motion for judgment on the administrative record and/or summary judgment and the parents filed a motion for judgment on the administrative record.   Those motions have been fully briefed.   For the reasons set forth below, we will grant the School District's motion and deny the parents' motion.

## III. OVERVIEW OF IDEA FRAMEWORK AND STANDARD OF REVIEW.

Congress enacted the IDEA to *inter alia* "ensure that all children with disabilities have available to them a free appropriate public education that

emphasizes special education and related services designed to meet their unique

needs and prepare them for further education, employment, and independent living."

20 U.S.C. § 1400(d)(1)(A).   "States receiving federal funding for assistance in the

education of children with disabilities under the IDEA are responsible for providing

a FAPE to any students who are identified as learning disabled until they reach 21

years of age." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014).

> The IDEA defines a FAPE as:

> special education and related services that--(A) have been
> provided at public expense, under public supervision and
> direction, and without charge; (B) meet the standards of the State
> educational agency; (C) include an appropriate preschool,
> elementary school, or secondary school education in the State
> involved; and (D) are provided in conformity with the
> individualized education program required under section
> 1414(d) of this title.

20 U.S.C. § 1401(9).   "Special education" is "specially designed instruction, at no

cost to parents, to meet the unique needs of a child with a disability." 20 U.S.C.A.

§ 1401(29).   In addition to the FAPE requirement, the IDEA provides that states

must establish procedures that assure that, to the maximum extent appropriate,

children with disabilities are educated with children who are not disabled. 20 U.S.C.

§ 1412(a)(5).

> The IDEA establishes a collaborative process between parents and schools.

*Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012).   A school district must

collaborate with the student's parents to design an IEP for the student, and the IEP is the primary vehicle for providing students with the required FAPE. *Id.; S.H. v. State-Operated School of Dist. of the City of Newark,* 336 F.3d 260, 264 (3d Cir. 2003).   "The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 173 (3d Cir. 1988).   The IEP must provide the student with a "basic floor of opportunity," but it is not required to provide an "optimal level of services." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010)(quoting *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 590 (3d Cir. 2000) and *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995)).

The IDEA imposes numerous procedural safeguards to ensure proper development of the IEP and to protect the rights of parents to challenge the IEP. *Bd. of Educ. of Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 205-07 (1982).   While a school district must comply with the IDEA's procedural requirements, "compliance is not a goal in itself; rather, compliance with such procedural requirements is important because of the 'requirements' impact on students' and parents' substantive rights.'" *Ridley*, 680 F.3d at 274 (quoting *D.S.,*

602 F.3d at 565).   Thus, "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S*, 602 F.3d at 565.

A parent that thinks that an IEP is inappropriate may seek an administrative due process hearing. *D.S.,* 602 F.3d at 557.   While most requests for due process hearings are made by parents, in certain situations, a school district may also seek an administrative due process hearing. *Schaffer v. Weast,* 546 U.S. 49, 53 (2005).   At the administrative level, the burden of proof is on the party seeking relief. *Id.* at 62. "A party to the due process hearing aggrieved by its outcome has the right to bring a civil action challenging the decision in any state court of competent jurisdiction or in a federal district court, without regard to the amount in controversy." *D.S.,* 602 F.3d at 558 (citing 20 U.S.C. § 1415(i)(2)).   At the district-court level, the burden of proof is on the party challenging the administrative decision. *Ridley*, 680 F.3d at 270.

In actions brought under the IDEA, "the court—(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).   A

district court may exclude additional evidence for a particular reason such as when it is cumulative or is an improper embellishment of testimony previously given at the administrative hearing. *See Bernardsville Bd. of Educ. v. J.H.,* 42 F.3d 149, 161 (3d Cir. 1994).   "While a district court appropriately may exclude additional evidence, it must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal has been reached for the child involved." *Susan N. v. Wilson School Dist.,* 70 F.3d 751, 760 (3d Cir. 1995).

The standard a court uses under the IDEA to review a Hearing Officer's decision is unique.   The court applies a modified *de novo* standard of review. *S.H.,* 336 F.3d at 270.   In reviewing the decision of a Hearing Officer under the IDEA, the district court must make its own findings by a preponderance of the evidence. *Shore Regional High School Bd. of Educ. V. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004). But, in order to prevent district courts from imposing their own views of preferable educational methods on the states, the court must give "due weight" to the administrative proceedings. *Rowley*, 458 U.S. at 205-06.   "Under this standard, '[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and '[i]f a reviewing court fails to adhere to them, it is obliged to explain why.'" *Shore Regional,* 381 F.3d at 199 (quoting *S.H.,* 336 F.3d at 271).

The court must accept credibility determinations made by the state agency unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion. *Id.*   "In this context the word "justify" demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court." *Id.*   An appellate court reviews the district court's factual findings for clear error. *Id.*   A finding of fact is clearly erroneous when, after reviewing the evidence, the court is left with a definite and firm conviction that a mistake has been committed. *Id.*   Where the district court hears additional evidence, however, it is "'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act.'" *S.H.,* 336 F.3d at 270 (quoting *Oberti v. Bd. of Educ.,* 995 F.2d, 1204, 1220 (3d Cir. 1993)).   The hearing officer's legal conclusions are subject to plenary review. *A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*, No. 1:13-CV-2379, 2015 WL 390864, at *8 (M.D. Pa. Jan. 28, 2015).

## IV. Independent Educational Evaluation.

The parents challenge the August 20, 2012 decision of the Hearing Officer finding that M.S. was not entitled to an independent educational evaluation paid for by the School District.

10

An independent education evaluation is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(a)(3)(i).   If a parent disagrees with an evaluation by the public agency, the parent has a right to an independent educational evaluation, and unless the public agency files a due process complaint and establishes that its evaluation was appropriate; the public agency must pay for the independent educational evaluation. *Id.* at §300.502(b).   But if it is determined "that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense." *Id.* at §300.502(b)(3).

"The school district must conduct an evaluation of the student's needs, assessing all areas of suspected disability, before providing special education and related services to the child." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009).   The IDEA imposes a number of requirements for evaluations and reevaluations by a public agency.   In conducting an evaluation, the agency must: "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information;" "not use any single measure or assessment as the sole criterion for determining" an appropriate educational program; and "use technically sound instruments that may assess the relative

contribution of cognitive and behavioral factors, in addition to physical or developmental factors." 20 U.S.C. § 1414(b)(2)(A)-(C).   In addition, the agency must, among other things, ensure that assessments are conducted by trained and knowledgeable personnel; that the child is assessed in all areas of suspected disability; and that "assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided." *Id.* at § 1414(b)(3).   The IEP team and other appropriate qualified professionals must also review existing data on the child and identify if any additional data is needed to determine: whether the child has a disability, the "present levels of academic achievement and related developmental needs of the child," whether the child needs special education and related services, and whether additions or modifications to the special education and related services are needed to enable the child to meet the goals set forth in the child's IEP and to enable the child to appropriately participate in the general education curriculum. *Id.* at § 1414(c).

### A. The Administrative Record and the Hearing Officer's Findings and Conclusions.

The Hearing Officer held a hearing on the School District's administrative due process complaint.   Four witnesses testified at the hearing: (1) Tara Pierce, the School District's school psychologist, who testified about the School District's

initial evaluation of M.S., about the reevaluation of M.S. in March of 2012, about

Dr. Dowell's report and his diagnosis of a nonverbal learning disability, and about

how the School District was already implementing many of the recommendations of

Dr. Dowell; (2) Dr. David Fassett, the School District's Supervisor of Special

Education, who testified about the number of times that M.S. had been evaluated in

the past year, about his opinion that there was no need for another evaluation, and

about his decision to limit M.S.'s mother's communications with the IEP team;

(3) Deanna Stepp, M.S.'s mother, who testified about M.S.'s problems in the

2011-2012 school year, about Dr. Dowell's evaluation, about the limit on her

communication with the IEP team, about her request for an independent education

evaluation and her reasons for that request, and about the independent educational

evaluation of M.S. by Alan Babcock in May of 2012; and (4) Alan Babcock,[3] the

private school psychologist who performed an independent educational evaluation

on M.S., and who testified about his evaluation and testing of M.S. and about the

School District's shortcomings in their testing and recommendations as to M.S.

The parties also entered numerous documents into evidence at the hearing.

---

3   Although Babcock identified himself as Charles Alan Babcock at the
administrative hearing, he used Alan Babcock on his report and his *curriculum vitae*.
Thus, we refer to him as Alan Babcock.

By a decision dated August 20, 2012, the Hearing Officer determined that

M.S. was not eligible for an independent educational evaluation paid for by the

School District because the March 2012 reevaluation by the School District was

appropriate.

## 1. The Hearing Officer's Findings of Fact.

Based on the testimony at the hearing, the Hearing Officer found the

following facts.   The School District's initial evaluation of M.S. in May of 2011

"was a wide ranging evaluation the considered both behavior and academic skills."

*Doc. 3, Exhibit 11,* at ¶17.   The School District considered input by M.S.'s mother,

who was concerned about M.S.'s lack of focus and his poor math skills, as well as

observations of M.S. by the school counselor, the school psychologist, a school

psychologist intern, and M.S.'s third-grade teacher. *Id.*   The School District also

considered M.S.'s grades and school assessments. *Id.*   The school psychologist

administered various tests and assessments, which revealed that M.S. had a

full-scale IQ of 90 (within the average range) and that while some of his math scores

on an academic achievement test were low, M.S. performed better on later math

assessments. *Id.*   The school psychologist also interviewed M.S. *Id.*   M.S.'s

teacher completed the Adjustment Scales for Children and Adolescents and the

Scale for Assessing Emotional Disturbance. *Id.*   Both M.S.'s teacher and his mother

rated him using the Behavior Assessment System for Children (BASC), and M.S.'s

adaptive behaviors were within the average range. *Id.*   M.S.'s teacher emphasized

to the school psychologist that M.S. had problems focusing, but he responded well

when she tried adaptations in the classroom to help him focus. *Id.*

The October 11, 2011 IEP placed M.S. in the regular education classroom for

93% of the school day for fourth grade. *Id.* at ¶18.   The IEP provided for specially

designed instruction and goals to help M.S. with his focus and provided additional

support during his math class. *Id.*   Also, M.S. spent the first 15 minutes and last 15

minutes of his school day in the emotional support classroom. *Id.*   The learning

support instructional assistant was available to help M.S. during his math class. *Id.*

The IEP also included the related service of counseling with the school social worker

for 30-minute sessions, once every cycle. *Id.*   The IEP further provided that a

behavior support plan was to be adopted later, and it designated Dr. Fassett as the

single point of contact for M.S.'s mother to express her concerns about the IEP. *Id.*

The School District conducted a functional behavioral assessment of M.S. on

December 15, 2011, and based on that assessment, it developed a positive behavior

support plan designed to address M.S.'s social and behavioral issues. *Id.* at ¶19.

15

M.S.'s parents obtained a neuropsychological assessment of M.S. from Dr. Dowell. *Id.* at ¶20.   Dr. Dowell conducted his assessment of M.S. on December 14, 2011 and January 5, 2012. *Id.*   He concluded that M.S. had a nonverbal learning disorder and an adjustment reaction with mixed disturbance of emotions and conduct. *Id.*   Dr. Dowell noted that the family history was remarkable for significant problems including aggression, depression, anxiety or adjustment problems, panic disorder, and arrests/incarceration. *Id.*   Some of the test scores obtained by Dr. Dowell were invalid, and he made no specific academic recommendations because he did not do any academic testing as part of his assessment of M.S. *Id.*   Dr. Dowell recommended a follow-up evaluation and development of an intervention plan by a specific school psychologist—Alan Babcock. *Id.*   Dr. Dowell's report contains other recommendations based upon general characteristics of children with nonverbal learning disabilities. *Id.*   M.S.'s mother provided Dr. Dowell's report to the School District's school psychologist and special education director, but she did not provide it to the other IEP team members because she felt that the report was sensitive and she did not want other staff to see it. *Id.* at ¶21.

As a result of M.S.'s mother providing Dr. Dowell's report to certain members of the IEP team, the school district conducted a reevaluation of M.S. *Id.* at

¶22.   The School District's school psychologist—Tara Pierce—conducted a

records review of the School District's previous assessments, which were less than a

year old, and she concluded that no new data was necessary. *Id.* at ¶23.   She did,

however, obtain updated parent and teacher input and she reviewed the functional

behavioral assessment and the positive behavior support plan, which the School

District had developed with the assistance of the intermediate unit. *Id.*   Pierce also

considered classroom-based assessments and M.S.'s current grades as well as

observations made by M.S.'s regular education classroom teacher, his learning

support teacher, his emotional support teacher, and the school social worker. *Id.*

M.S.'s teachers and providers all felt that he was making progress and that his

current specially designed instruction and IEP as well as the positive behavior

support plan were adequately meeting M.S.'s needs academically, behaviorally, and

socially. *Id.*   The School District also completed an addendum to the reevaluation

report concluding that M.S. did not have a specific learning disability. *Id.*

   As part of the reevaluation, Pierce summarized Dr. Dowell's report and

concluded that while M.S. had some characteristics of a nonverbal learning

disability, he did not have other characteristics. *Id.* at ¶24.   One characteristic of a

nonverbal learning disability that M.S. did not demonstrate was problems with

visual perception. *Id.*   M.S. received average to above average scores in interpreting

charts, tables, and graphs when Pierce performed, in connection with the initial evaluation, additional math assessments on him. *Id.*   M.S. did not have problems with visual perceptual issues. *Id.*   Pierce noted that the School District had already implemented in M.S.'s educational program most of the recommendations made by Dr. Dowell. *Id.*   She concluded that M.S. was progressing within the regular education environment with the supports and services in his IEP and that his needs were being addressed by his work with the social worker and the emotional support teacher as well has by his positive behavior support plan. *Id.*   Pierce encouraged the IEP team to focus on M.S.'s needs rather than his diagnosis. *Id*

On March 28, 2012, the IEP team met to discuss the School District's reevaluation report. *Id.* at ¶25.   At that meeting, M.S.'s mother and her attorney expressed concerns that based on Dr. Dowell's report, M.S.'s disability eligibility category needed to be changed from other health impairment to specific learning disability. *Id.*   Also, at that meeting, Tara Pierce expressed concerns about Dr. Dowell's evaluation. *Id.*

On April 19, 2012, M.S.'s parents sent a letter to Dr. Fassett requesting an independent educational evaluation at public expense, and in that letter, they described their concerns that the disability eligibility category on M.S.'s IEP was incorrect and should be changed to specific learning disability based on the

diagnosis made by Dr. Dowell. *Id.* at ¶26.   Noting that, in the third marking period,

M.S.'s grades dropped from C to D in spelling and from B to D in social studies, the

parents expressed their concern that M.S. continued to struggle academically. *Id.*

They requested an independent education evaluation by Alan Babcock, the same

school psychologist named in Dr. Dowell's report. *Id.*

M.S.'s mother felt that the School District's reevaluation was not complete.

*Id.* at ¶27.   She wanted the School District to incorporate into M.S.'s IEP the

diagnosis and recommendations made by Dr. Dowell, and, in particular, she wanted

M.S.'s disability eligibility category changed from "other health impaired" to

"specific learning disability." *Id.*

Dr. Fassett sent a letter to M.S.'s parents declining to provide an independent

educational evaluation at public expense. *Id.* at ¶28.   Concerning the category of

disability, Dr. Fassett stated that "identification does not drive placement in his

district and . . . [M.S.] is getting all the learning support services he would get if he

was identified [as] having a specific learning disability." *Id.*   Dr. Fassett also noted

that M.S. had been tested a number of times within the last year. *Id.*   The School

District refused the request for an independent educational evaluation at public

expense because it concluded that it was not necessary. *Id.*   Prior to sending the

rejection letter, Dr. Fassett conferred with Tara Pierce and other members of M.S's

IEP team. *Id.*

The parents had Alan Babcock conduct an independent educational

evaluation of M.S. in May of 2012. *Id.* at ¶30.   In an unfinished draft report,[4]

Babcock concluded that M.S.'s disability category should be changed. *Id.*

Babcock's reason for that conclusion was that it would help M.S.'s mother, who was

an anxious person, feel included. *Id.*   Babcock also concluded that M.S. did not

have ADHD. *Id.*   Babcock's report contains numerous recommendations, many of

which were already in place for M.S. in the educational program developed for him

by the School District. *Id.*

Toward the end of the 2011-2012 school year, M.S. had a number of behavior

incidents, many of which had a sexual component. *Id.* at ¶31.   At the end of April of

2012, M.S. was disciplined for telling another student that he wanted to have sex and

to make babies with her. *Id.*   On two occasions in early May, M.S. engaged in

inappropriate sex talk. *Id.*   On another occasion, he told a student that he wanted to

have kids with her and to "go at it" in bed, and he engaged in name calling. *Id.*   In

---

4 A draft report by Babcock was introduced into evidence in the administrative
hearing because the parents did not provide Babcock's final report sufficiently in
advance of the administrative due process hearing to comply with administrative
rules. *See Doc. 31-2* at 4.

early May of 2012, two girls accused him of sexual harassment saying that he made lewd and inappropriate statements to them. *Id.*   A few days later, he used lewd and inappropriate language with a young girl. *Id.*   In mid-May, he was accused of sexual harassment for making lewd and inappropriate statements to two students and saying that he would kill their parents so that they would have to watch them die. *Id.*

School District personnel twice reported M.S.'s parents to Children and Youth Services as a result of M.S.'s inappropriate sexual conduct. *Id.*   Near the end of April, an investigator with Child and Youth Services interviewed M.S. about doing inappropriate things with his hands and visiting inappropriate websites. *Id.* M.S. admitted those behaviors. *Id.*   The complaint based on those incidents was later closed without adverse action. *Id.*   Near the end of May, the investigator investigated another incident, which M.S. denied. *Id.*

Beginning when he was in second grade, M.S.'s mother arranged for him to receive private counseling. *Id.* at ¶32.   That private counseling continued once a week through the date of the due process hearing. *Id.*   M.S.'s mother did not share information about the private counseling with the School District. *Id.*

M.S.'s report card for the 2011-2012 school year contained the following final grades for his work in his regular education classroom: C in reading; D in

writing/grammar; C in mathematics; D in spelling; C in social studies; B in science; A in art, A in physical education, and A in music. *Id.* at ¶33.

At the time the parents requested an independent educational evaluation, M.S. was making meaningful educational progress and his specially designed instruction and IEP as well as his positive behavior support plan were adequately meeting his needs academically, behaviorally, and socially. *Id.* at ¶34.

From October of 20011 through the end of the 2011-2012 school year, Dr. Fassett required M.S.'s mother to communicate only with him concerning matters affecting M.S.'s IEP. *Id.* at ¶35.   The School District thought that M.S.'s mother was making too many demands on district staff and wanted to have one point of contact so that all information shared would be the same. *Id.*   The School District did not attempt to meet with M.S.'s mother to attempt to resolve the issue or limit the number of communications before announcing at one of the IEP team meetings that Dr. Fassett would be the sole point of contact for IEP purposes. *Id.*

### 2. The Hearing Officer's Conclusions of Law.

The Hearing Officer concluded that the School District met its burden of establishing that its revaluation of M.S. in March of 2012 was appropriate.   In so concluding, he found the testimony of Tara Pierce regarding how she conducted the

reevaluation credible and he noted that her testimony was corroborated by the

documentary evidence.   The Hearing Officer also found that the School District's

reevaluation report thoroughly documented the comprehensive reevaluation process

described by Pierce.   Further, the Hearing Officer concluded that although the

School District was not required to accept Dr. Dowell's diagnosis, it did consider Dr.

Dowell's report:

> . . . [T]he law does not require that the school district make changes to the student's IEP in order to reflect the diagnosis made by the neuropsychologist and endorsed by the parents' expert school psychologist, that is that the student had a nonverbal learning disability.   Under IDEA, a medical practitioner, or other expert, may not simply prescribe special education or components of an IEP; rather, the IEP team must consider all relevant factors.   A school district is required to consider any evaluation or other input provided by a parent, and the record evidence in this case reveals that the school district did consider the opinion of the neuropsychologist that the student had a nonverbal disability, but rejected his conclusion based upon the fact that he did not do any academic testing and that his recommendations were very general, and that it was based upon the disability category rather than upon the individual needs of the student, and that the student did not have the visual-perception problems suggested by the outside evaluator. Accordingly, it is concluded that the school district duly considered the input from the parents, including the report of the neuropsychologist, during the reevaluation process.

*Doc. 31* at 51 (citations omitted).

Although M.S.'s mother testified that she thought the School District's

reevaluation was inappropriate, the Hearing Officer found the testimony of the

witnesses for the School District more credible and persuasive than the parent's

witnesses on the issue of the appropriateness of the reevaluation.   The Hearing

Officer also concluded that the parent's focus on the category of disability was

misplaced:

> . . . IDEA does not concern itself with labels, but whether a
> student with a disability is receiving a free and appropriate
> public education; a disabled child's IEP must be tailored to the
> unique needs of that particular child.   Regardless of the category
> of eligibility, each child with a disability is entitled to
> individually designed special education and related services.
> The child's identified needs, not the child's disability category
> determines the services that must be provided to the child.
>      Accordingly, the parent's focus on the category of
> disability, and more particularly upon the nonverbal learning
> disability diagnosed by the neuropsychologist, is misplaced.
> All parties agree that the student is eligible for special education
> and related services under IDEA.   No further analysis of
> category of disability is necessary or relevant.

*Doc. 31* at 48-49 (citations omitted).

The Hearing Officer further found that Alan Babcock's reliance on the

category of disability undermined his credibility, and he rejected Babcock's

conclusion that the category of disability should be changed to make M.S.'s mother

feel included:

> The parents cite no authority in their post-hearing brief for
> the proposition that a school district should change the category
> of disability in order to make a parent feel more included in the
> process.   IDEA does not require such an action by a school
> district.   Indeed, there is a danger if a school district were to

24

> pursue such an action that it might cause a parent, particularly if
> a parent were relatively unsophisticated, to believe that services
> are determined based upon eligibility category.   Such
> stereotyping of children with disabilities is the opposite of the
> consequence that was intended by Congress in passing IDEA.
> Students with disabilities are ***individuals.***

*Id.* at 50 (emphasis in original).   The Hearing Officer also determined that the

parents' argument for changing the category of disability "exalts form over

substance" and that focusing on the category disability "deflects attention from the

fact that the school district had already implemented many of the recommendations"

made by Dr. Dowell. *Id.*


### B.   Discussion.

After considering the administrative record, we agree with the Hearing

Officer's findings of facts.   Based on those findings, we conclude, as did the

Hearing Officer, that the parents are not entitled to an independent educational

evaluation at public expense.

Although not clearly briefed,[5] the parents make a number of arguments for

why, contrary to the Hearing Officer's findings, the School District's reevaluation

was not appropriate.   The parents' overarching contention is that the School District

---

5 The argument sections of the parents' briefs are, to a great extent, a mishmash of
legal standards, statements of what happened, and summaries of witness testimony.
In many instances, the parents do not clearly set forth their arguments.

issued its reevaluation report without fully considering Dr. Dowell's assessment and without assessing M.S. for a specific learning disability using current data.   As did the Hearing Officer, we reject that contention.   Tare Pierce's testimony shows that the School District considered Dr. Dowell's assessment.

The parents assert that the School District attached the learning disability analysis from the initial evaluation report as an addendum to the reevaluation report, and, according to them, this shows that the School District did not fully consider Dr. Dowell's assessment of a nonverbal learning disability.   The last five pages (titled "Determination of Specific Learning Disability") of the reevaluation report were attached to the reevaluation report as an addendum. *See Doc. 31-4* at 51-55.   While this section of the reevaluation report does incorporate data from the School District's initial evaluation of M.S., it also includes updated information as well. *Id.* Moreover, the initial evaluation was completed on May 18, 2011, only 10 months before the reevaluation report, and given this close temporal proximity, the fact that the School District included information from its initial evaluation does not undermine the Hearing Officer's finding that the School District considered Dr. Dowell's assessment.

The parents also point to an email from Dr. Fassett as purportedly showing that the School District did not fully consider Dr. Dowell's report.   In that email, which attached the addendum to the reevaluation report, Dr. Fassett stated:

> Considering Dr. Dowell's report: Because the entire team has not been privy to Dr. Dowell's report, only a summary at your request, and Dr. Dowell's report is missing some testing and scores we would need to make an LD determination, we see no need to change [M.S.]'s identification at this time.   It would change nothing in the services/support he is already provided with.

*Doc. 31-6* at 48.   Contrary to the parents' argument, this email does not show that the School District did not consider Dr. Dowell's assessment.   Rather, it shows that the School District did not believe that it was necessary to change M.S's category of disability.

The parents also contend that the School District's school psychologist, Tara Pierce, informed them at the March 28, 2012 reevaluation meeting that she had several questions about Dr. Dowell's report and that without answers to those questions she could not fully consider his findings.   In support of that contention, they point to the letter they sent to the School District requesting an independent educational evaluation. *See Doc. 31-4* at 56-57.   That letter, however, does not undermine Pierce's testimony regarding the scope of the reevaluation or her testimony that she did, in fact, consider Dr. Dowell's assessment.

The parents assert that the School District failed to determine M.S.'s

educational needs.   In this regard they assert that although the School District

identified weaknesses in M.S.'s processing speed, working memory, and perceptual

reasoning, it failed to explain how those deficits related to his academic performance

and needs.   They also assert that the School District failed to assess M.S.'s visual

motor skills, which are related his perceptual reasoning.   But, in its initial

evaluation, the School District did consider M.S.'s processing speed, working

memory, and perceptual reasoning and how those things affected him:

> [M.S.]'s unique set of thinking and reasoning abilities
> make his overall intellectual functioning difficult to summarize
> by a single score on the Wechsler Intelligence Scale for
> Children-Fourth Edition (WISC-IV).   His verbal reasoning
> abilities are much better developed than his nonverbal reasoning
> abilities.   Making sense of complex verbal information and
> using verbal abilities to solve novel problems are a strength for
> [M.S.].   Processing complex visual information by forming
> spatial images of part-whole relationships and/or by
> manipulating the parts to solve novel problems without using
> words is a weakness.
>
> [M.S.]'s verbal reasoning abilities as measured by the
> Verbal Comprehension Index are in the High Average range and
> above those of approximately 75% of his peers (VCI = 110; 90%
> confidence interval = 104-115).   The Verbal Comprehension
> Index is designed to measure verbal reasoning and concept
> formation.   [M.S.] performed comparably on the verbal subtests
> contributing to the VCI, suggesting that these verbal cognitive
> abilities are similarly developed.
>
> [M.S.]'s nonverbal reasoning abilities as measured by the
> Perceptual Reasoning Index are in the Low Average range and

above those of only 14% of his peers (PRI = 84; 90 % confidence interval = 79-92).   The Perceptual Reasoning Index is designed to measure fluid reasoning in the perceptual domain with tasks that primarily assess nonverbal fluid reasoning and perceptual organization abilities.   [M.S.] performed comparably on perceptual reasoning subtests contributing to the PRI, suggesting that his visual-spatial reasoning and perceptual-organizational skills are similarly developed.   [M.S.] performed much better on tasks that require abstract concept formation and categorical reasoning that must be verbally expressed (Similarities = 12), than tasks requiring abstract categorical reasoning without verbal expression required (Picture Concepts = 8).

[M.S.]'s ability to sustain attention, concentrate, and exert mental control is in the Average range.   He performed better than approximately 27% of his age-mates in this area (Working Memory Index = 91; 90% confidence interval 85-98).

[M.S.]'s abilities to sustain attention, concentrate, and exert mental control are a weakness relative to his verbal reasoning abilities.   A relative weakness in mental control may make the processing of complex information more time-consuming for [M.S.], draining his mental energies more quickly as compared to other children his age, and perhaps result in more frequent errors on a variety of learning tasks.

Although clearly weaker than his verbal reasoning abilities, [M.S.]'s ability to exert mental control is still within the Average range and better than that of approximately 27% of his age-mates (Working Memory Index = 91; 90% confidence interval 85-98).

[M.S.]'s ability in processing simple or routine visual material without making errors is in the Low Average range when compared to his peers.   He performed better than approximately 9% of his peers on the processing speed tasks (Processing Speed Index = 80; 90% confidence interval 75-90). Processing visual material quickly is an ability that [M.S.] performs poorly as compared to his verbal reasoning ability. Processing speed is an indication of the rapidity with which [M.S.] can mentally process simple or routine information

> without making errors.   Because learning often involves a
> combination of routine information processing (such as reading)
> and complex information processing (such as reasoning), a
> weakness in the speed of processing routine information may
> make the task of comprehending novel information more
> time-consuming and difficult for [M.S.].   Thus, this weakness in
> simple visual scanning and tracking may leave him less time and
> mental energy for the complex task of understanding new
> material.

*Doc 31-3* at 7.   While the above analysis is from the initial evaluation of M.S. rather

than the reevaluation, the reevaluation report referred to this earlier testing, *see doc.*

*31-4* at 40, and the School District was not required to repeat this information

verbatim from the earlier evaluation, particularly in this case given the temporal

proximity between the initial evaluation and the reevaluation.   Rather, as the

Hearing Officer observed (albeit in the context the parents' argument that the

reevaluation failed to consider M.S.'s social and emotional needs), "[t]he

reevaluation must be evaluated in the context of the entire educational program

offered to the student." *Doc. 31* at 53.

The parents also suggest that the School District did not assess M.S.'s

adaptive behaviors.   The Hearing Officer properly considered and rejected that

argument noting that Tara Pierce assessed M.S.'s adaptive behaviors during the

initial evaluation "including administering the BASC assessment, which showed

[M.S.]'s adaptive behaviors to be in the average range." *Doc. 31* at 52.   Further, as

found by the Hearing Officer, Pierce reviewed "[t]he existing data, including the

BASC test results" during the reevaluation. *Id.*

The parents also suggest that the positive behavior support plan was

insufficient because it did not set forth sufficiently specific behaviors to replace his

problem behaviors.   In addressing the parents' contention that the School District

failed to sufficiently identify M.S.'s social and emotional needs, the Hearing Officer

reasoned:

> The record evidence, however, reveals that the school
> district had conducted a thorough functional behavior
> assessment of the student and that from that it developed a
> positive behavior support plan to address the student's social and
> emotional needs.   In addition, the student's IEP recognized that
> the student had certain social-emotional needs and those needs
> were addressed in the IEP, including support from the emotional
> support teacher as well as the related service of counseling with
> the school social worker.   It appears that the parents are arguing
> that the appropriateness of the reevaluation should be determined
> in isolation.   There is no requirement that a school district repeat
> verbatim every component of a student's IEP or behavior plan in
> detail in a report of a reevaluation.   The reevaluation must be
> evaluated in the context of the entire educational program
> offered to the student.   The school district school psychologist
> provided credible and persuasive testimony that all of the
> student[']s teachers and service providers felt that the student
> was making progress and that the student's current specially
> designed instruction and IEP as well as his positive behavior
> support plan were adequately meeting his needs academically,
> behaviorally and socially.   This testimony is corroborated by
> the report of the reevaluation.   Clearly the school district had

31

> appropriately identified and addressed the student's
> social-emotional needs.

*Doc. 31* at 52-53.   Although M.S.'s behavior began to deteriorate toward the end of

the 2011-2012 school year, the evidence was that the positive behavior support plan

was working reasonably well at the time the reevaluation report was completed at

the end of March 2012.

The parents also assert that the Hearing Officer erred in stating that the

parents were seeking a change in M.S.'s category of eligibility.   In this regard, the

parents assert that they were focused on obtaining an appropriate evaluation so that

M.S.'s needs could be appropriately identified and the IEP team would have the

information needed to provide M.S. with appropriate aids and services.   We

recognize that the parents wanted this and that they were interested in more than just

a *pro forma* change in the category of eligibility.   And we think that the Hearing

Officer recognized that as well.   In fact, the Hearing Officer found that in the

parents' request for an independent educational evaluation, they noted that some of

M.S.' grades had dropped and that he was struggling academically. *Doc. 31* at 38.

He did not deny the request for an independent educational evaluation on the basis

that the parents were merely seeking a change in the category of disability.   Rather

he found that School District's reevaluation was appropriate, that it did consider Dr.

Dowell's opinion, and that M.S. was making meaningful educational progress. *Id.* at

42 & 46-47, 51.   And he specifically addressed the parents' arguments that the School District's reevaluation was not appropriate. *Id.* at 51-55.

The parents also assert that, on March 1, 2012, the School District denied their request for an IEP meeting even though a functional behavioral assessment, a positive behavior support plan, and Dr. Dowell's evaluation had been completed since the previous IEP meeting.   The reason the School District gave for refusing the IEP meeting was that it did "not believe that any new ground can or will be covered until [M.S.]'s latest [reevaluation] is completed." *Doc. 31-4* at 32.   The parents have failed to show that the denial in early March of an IEP meeting had any effect on the appropriateness of the School District's reevaluation.

The parents suggest that the school district withheld information from them and they point to the limit on their communication with Dr. Fassett.   But there is no evidence that that limitation had an effect on the School District's reevaluation.

The parents assert that Dr. Dowell's report and Alan Babcock's draft report both identify significant diagnostic needs which the School District failed to address in its reevaluation report.   The parents, however, fail to set forth what those needs were.   They also assert that the Hearing Officer stated that many of the recommendations made by Babcock are already in place, but Babcock's draft psychological evaluation has a total of 19 pages of recommendations and the School

District's last IEP was dated October 11, 2011.   It is not clear what the parents' argument is here.

The parents make several additional arguments for why the School District's reevaluation was inadequate.   They rely, however, on evidence that was not presented at the administrative hearing with respect to the independent educational evaluation.   For example, the parents contend that the School District relied on reevaluation input from two special education teachers who were not involved in any significant degree in providing special education services to M.S. in the regular classroom.   In this regard, they rely on testimony from M.S.'s learning support and emotional support teachers.   But neither of those teachers testified at the due process hearing in connection with the due process complaint filed by the School District regarding the independent education evaluation.   Rather, those teachers testified in the separate hearing regarding the parent's due process complaint about the purported denial of a FAPE during the 2011-2012 school year and compensatory education for that purported denial.   Thus, we do not consider their testimony in connection with the appeal of the Hearing Officer's decision regarding the independent educational evaluation.   In any event, the input from these teachers was only one part of the information that the School District relied on in its reevaluation.

The parents also contend that the School District withheld from them and from Tara Pierce 143 pages of daily behavior data, and they point to an exhibit submitted by the School District in connection with the due process hearing on their due process complaint.   Again, that evidence was not presented in the due process hearing concerning the independent educational evaluation.   Moreover, the parents fail to explain how withholding that data from them affected the School District's reevaluation.   And they have not pointed to evidence to support their assertion that Tara Pierce was not aware of that data.   In fact, Pierce testified that she was aware that the School District was using a behavioral chart and collecting information on M.S. on a daily basis, and she testified that she reviewed portions of that documentation in her reevaluation. *Doc. 31-2* at 17.   Further, she specifically notes in the reevaluation report itself that M.S. "has a daily behavior chart." *Doc. 31-4* at 45.   The parents' argument in this regard is frivolous.

The Hearing Officer concluded that the School District's reevaluation "was appropriate and complied with all legal requirements," and thus, the parents are not entitled to an independent educational evaluation at public expense. *Id.* at 55.   After reviewing the administrative record and considering the arguments of the parties, we agree.

## V.   Compensatory Education.

In their administrative due process complaint, the parents claimed that the School District denied M.S. a free appropriate public education and discriminated against him during the 2011-2012 school year, and they sought compensatory education for M.S.[6]   By a decision dated August 25, 2012, the Hearing Officer found that, near the end of the 2011-2012 school year, the School District denied M.S. a FAPE by denying his mother a meaningful opportunity to participate in the educational process.   But because the denial of a FAPE was limited to the last portion of the school year and resulted in M.S. not receiving social work services as set forth in his IEP, he awarded only four hours of compensatory education to make up for the lost social work services.

"The core of the IDEA is the collaborative process that it establishes between parents and schools." *Ridley*, 680 F.3d at 269.   A school district must collaborate with the student's parents to design an IEP for the student, and the IEP is the primary

_____

6 The parents also sought to continue to have M.S. educated in the regular education classroom for 93% or more of the time during the 2012-2013 school year as well as to have the School District conduct an "SaS toolkit" within the first 45 days of the 2012-2013 school year.   Prior to the administrative hearing, the parties informed the Hearing Officer that they resolved by mutual agreement all issues except the issue of compensatory education if a violation of the IDEA is found.

vehicle for providing students with the required FAPE. *Id.; S.H.* 336 F.3d at 264.

"The IEP consists of a detailed written statement arrived at by a multi-disciplinary

team summarizing the child's abilities, outlining the goals for the child's education

and specifying the services the child will receive." *Polk*, 853 F.2d at 173.   The IEP

team, which includes the student's parents and teachers, reviews "the IEP at least

annually to determine whether the stated goals for the student are being achieved."

*D.S.*, 602 F.3d at 557.   "When appropriate the team will revise the IEP to address,

among other things, lack of progress, necessary changes arising from reevaluation of

the child, and parental input." *Id.*

"The Supreme Court has construed the statute's FAPE mandate to require

'education specially designed to meet the unique needs of the handicapped child,

supported by such services as are necessary to permit the child 'to benefit' from the

instruction.'" *T.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir.

2000)(quoting *Rowley*, 458 U.S. at 188-89).   An IEP must offer more than a trivial

or de minimis educational benefit. *Id.* at 577.   "Though the IEP must provide the

student with a 'basic floor of opportunity,' it need not necessarily provide 'the

optimal level of services' that parents might desire for their child." *D.S.*, 602 F.3d at

557 (quoting *Holmes*, 205 F.3d at 590 and *Carlisle Area Sch.*, 62 F.3d at 534).

Thus, the state is not required to maximize the potential of a handicapped child, but

it must provide an education sufficient to confer "significant learning" and "meaningful benefit" to the child. *Id.* at 556.   The educational benefit of the IEP must be gauged in relation to the child's potential. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999).

If a student has been denied a FAPE, the court may award compensatory education to account for the period of that denial. *Mary T. v. School Dist. of Philadelphia,* 575 F.3d 235, 249 (3d Cir. 2009).   Compensatory education is a judicially created, "equitable remedy designed to replace the educational services a disabled child should have received pursuant to a FAPE." *Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, No. 13-CV-0115, 2014 WL 4092389, at *17 (M.D. Pa. Aug. 18, 2014).   It "serves to 'replace[ ] educational services the child should have received in the first place' and . . . such awards 'should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.'" *Ferren C. v. Sch. Dist. of Philadelphia*, 612 F.3d 712, 717-18 (3d Cir. 2010) (quoting *Reid v. District of Columbia,* 401 F.3d 516, 518 (D.C. Cir. 2005)).

The parents challenge the Hearing Officer's decision that M.S. is entitled to only four hours of compensatory education for the 2011-2012 school year.   They, instead, seek a total of 900 hours of compensatory education.

38

**A.   The Administrative Record and the Hearing Officer's Findings and Conclusions.**

The Hearing Officer held a hearing on the parents' administrative due process complaint.   Six witnesses testified at the hearing: (1) Jessica Shuman, a behavior support consultant with the Central Susquehanna Intermediate Unit, who testified about her observations of M.S. and about the development and implementation of the functional behavioral assessment and positive behavior support plan; (2) Shannon Woodling, M.S.'s fourth-grade teacher, who testified about what M.S. was like as a student, about his behavior, and about her implementation of his IEP; (3) Alan Babcock, the private school psychologist who performed an independent educational evaluation on M.S., and who testified about his evaluation and testing of M.S. and about the School District's shortcomings in their testing and recommendations as to M.S.; (4) Deanna Stepp, M.S.'s mother, who testified about M.S.'s problems in the 2011-2012 school year, about Dr. Dowell's evaluation, about her interaction with School-District staff, and about the limitation on her communications with staff and how that limitation made her feel; (5) Kathleen Troutman, a learning support teacher, who testified about the creation and implementation of M.S.'s IEP, about the assistance M.S. received in Math from an instructional assistant, and about Mrs. Stepp's communications with her; and

(6) Judy Grose, a special education teacher, who testified about her role in providing emotional support to M.S. and about her communications with Mrs. Stepp.

### 1.   The Hearing Officer's Findings of Fact.

The October 11, 2011 IEP placed M.S. in the regular education classroom for 93% of the school day. *Doc. 29-1* at ¶19.   It provided for specially designed instruction and goals to address M.S.'s needs and numerous modifications and accommodations to help support him. *Id.*   The IEP also provided for emotional/social work support for 30 minutes every six-day cycle. *Id.*   It also included consultations between the regular education teacher and special education teacher, as well as support from emotional support staff. *Id.*   Further, it specified that Dr. Fassett would be the "single point of contact" for M.S.'s mother to contact when she had concerns regarding the IEP. *Id.*

Ms. Woodling, M.S.'s regular education teacher, was primarily responsible for providing the specially designed instruction pursuant to the IEP. *Id.* at ¶20. M.S. was often disrespectful to his assigned aide during math class, and he resisted her efforts to assist him. *Id.* at ¶21.

On December 15, 2011, with the assistance of Jessica Shuman, a behavior consultant from the intermediate unit, the School District developed a functional

behavioral assessment of M.S. *Id.* at ¶22.   The functional behavioral assessment

identified the functions of M.S.' inappropriate behaviors as avoiding, escaping, or

postponing assigned tasks and gaining adult attention in the form of redirection and

prompting. *Id.*   Also on December 15, 2011, with Shuman's assistance, the School

District developed a positive behavior support plan to address M.S.'s problem

behaviors. *Id.* at ¶23.   M.S.'s mother expressed concerns about the behavior plan,

and Shuman responded in writing with explanations of the plan and responses to

each concern. *Id.*

Ms. Grose, the School District's emotional support teacher, was primarily

responsible for implementing M.S.'s positive behavior support plan. *Id.* at ¶24.

M.S. reported to Ms. Grose for the first 15 minutes of the school day in order to gear

up for the day and for the last 15 minutes of the school day in order to wind down

and prepare for his homework assignments. *Id.*   During this time, he talked with

Ms. Grose about problems that he might have been encountering. *Id.*

M.S.'s parents obtained a neuropsychological assessment of M.S. from Dr.

Dowell. *Id.* at ¶25.   Dr. Dowell conducted his assessment of M.S. on December 14,

2011 and January 5, 2012. *Id.*   He concluded in his report that M.S. had a nonverbal

learning disability. *Id.*   Dr. Dowell's report does not contain academic

recommendations because Dr. Dowell did not conduct any academic testing. *Id.*

Dr. Dowell recommended a follow-up intervention plan by a specific school psychologist—Alan Babcock. *Id.*   Dr. Dowell's report also contains other recommendations based on the needs of students with nonverbal learning disabilities in general. *Id.*

At first, M.S.'s mother provided Dr. Dowell's report to only the School District's school psychologist and special education director, but later she provided it to the IEP team members. *Id.* at ¶26.   As a result, the School District conducted a reevaluation of M.S. *Id.*   In a reevaluation report dated March 23, 2012, the School District considered Dr. Dowell's report, but it did not change M.S.'s category of disability or adopt the diagnosis of nonverbal learning disability. *Id.* at ¶27.   The School District noted that, according to Ms. Woodling, M.S. was functioning as an average student with his fellow classmates in mathematics. *Id.*   M.S.'s social worker reported that she had a positive working relationship with M.S. and that M.S. was making progress. *Id.*   She recommended that the current level of social work services be maintained. *Id.*   The reevaluation report notes that all of M.S.'s teachers felt that the IEP and positive behavior support plan were adequately meeting M.S.'s needs academically, behaviorally, and socially. *Id.*

Alan Babcock conducted a psychological evaluation of M.S. on May 19, 2012 and May 26, 2012. *Id.* at ¶28.   He prepared an initial draft report dated June 20,

2012. *Id.*   In that report, he recommended, among other things, that M.S.'s category of eligibility for special education be changed to specific learning disability as a result of Dr. Dowell's diagnosis of nonverbal learning disability. *Id.*   Babcock changed his initial report to include the specific learning disability recommendations as a result of conversations with M.S.'s mother and in order to make her feel more included in the process. *Id.*

M.S. was an average student. *Id.* at ¶29.   He was making academic progress, including progress in math, pursuant to the educational plan contained in his IEP. *Id.* M.S.'s final grades on his report card for the 2011-2012 school year were: C in reading; D in writing; C in mathematics; D in spelling; C in social studies; B in science; A in art, A in physical education, and A in music. *Id.*

M.S.'s behaviors at school fluctuated. *Id.* at ¶30.   Until the very end of the 2011-2012 school year, with the exception of a flare-up around the Christmas holidays and one other flare-up, M.S.'s behaviors were fairly well controlled in accordance with his positive behavior support plan. *Id.*   But M.S.'s inappropriate behaviors increased significantly near the end of the school year, and many of the behaviors were of a sexual nature. *Id.* at ¶31.   At the end of April of 2012, he told two young girls that he wanted to have sex with them. *Id.*   On an unspecified date, he again made statements about wanting to have sex with a number of girls in book

club. *Id.*   In early May, M.S. swore and used lewd language in book club, and he made an inappropriate, sex-related comment to a boy in math class. *Id.*   On another occasion, he called another student stupid and mean, and he told a young girl that he wanted to have kids with her. *Id.*   In mid-May, he made inappropriate sexual comments about a young girl at recess. *Id.*   Also, he made explicit sexual comments about a young girl to another boy, and he threatened to kill the girl's parents if she told. *Id.*   Near the end of May of 2012, he again made explicit, inappropriate sexually related comments to other students. *Id.* at ¶32.   On the last day that he attended school for the 2011-2012 school year, he pulled another boy's pants down. *Id.* at ¶31.

In mid-May, the School District charged M.S. with sexual harassment for some of these incidents, and he received a three-day out-of-school suspension. *Id.* at ¶32.   As a result of the changes in the nature of M.S.'s behaviors near the end of the school year, Dr. Fassett and Jessica Shuman considered conducting another functional behavior analysis to determine whether additional interventions were necessary. *Id.* at ¶33.

In October of 2011, Dr. Fassett imposed a restriction upon the communications that M.S.'s mother was allowed to make concerning M.S.'s IEP. *Id.* at ¶34.   The restriction prevented M.S.'s mother from talking to any IEP team

member other than Dr. Fassett concerning the IEP. *Id.*   Before imposing this restriction, Dr. Fassett did not discuss with M.S.'s mother whether she had been abusing her right to participate, nor did he provide her a warning. *Id.*   The restriction was announced at an IEP team meeting. *Id.*   This was the first time that M.S.'s mother learned that the School District considered her communications with other IEP team members to be improper. *Id.*   She felt extremely frustrated as a result of the restriction; she felt she was not part of the team. *Id.*

Prior to the due process hearing, M.S.'s mother requested all educational records concerning M.S. *Id.* at ¶35.   Once she reviewed the emails that were provided, she found an email in which Dr. Fassett made a joke with another IEP team member which was a pun concerning her last name that was intended to ridicule her for being overweight. *Id.*   In another email to Jessica Shuman, Dr. Fassett asked if he should "spank" M.S.'s mother for sending an email directly to Shuman. *Id.*   In still another email, Dr. Fassett referred to M.S.'s mother as M.S.'s "mouthpiece." *Id.*

Toward the end of the school year, M.S.'s mother terminated the services that M.S. was receiving from the School District's social worker. *Id.* at ¶36.   She did so in large part because she thought that the social worker was trying to bait M.S. into using inappropriate internet websites. *Id.*

45

M.S. received private counseling since the second grade. *Id.* at ¶38.   M.S.'s

parents did not share information about that counseling with school-district staff. *Id.*

For the last few days of the 2011-2012 school year, M.S. was placed on homebound

instruction because of anxiety issues he was experiencing, and he received

instruction from Ms. Woodling at the library. *Id.* at ¶37.

M.S.'s IEP was reasonably calculated to confer meaningful educational

benefit. *Id.* at ¶39.   The School District appropriately addressed M.S.'s behavioral

needs until the end of the 2011-2012 school year, but near the end of the school year,

M.S.'s behaviors began to impede his learning. *Id.* at ¶41.   The School District

denied M.S. a FAPE by failing to provide meaningful participation to M.S.'s mother

in his educational process. *Id.* at ¶40.

### 2.   The Hearing Officer's Conclusions of Law and Reasons for Awarding Four Hours of Compensatory Education.

The Hearing Officer concluded that the School District denied M.S. a FAPE

by failing to allow M.S.'s mother to meaningfully participate in his educational

process.   He found that four hours of compensatory education in the form of

counseling or similar services was appropriate to remedy the harm caused by that

denial.

Characterizing M.S.'s mother as "a handful," the Hearing Officer stated that she "engaged in a high volume of communication" with M.S.'s teachers and service providers.   Although the Hearing Officer found that the School District "would have been well within its right to place a reasonable limit on her communications with IEP team members," before doing so it should have first conferred with her, told her there was a problem, and requested that she limit her communication or, at least, given her some kind of warning.   Because the School District did not do that, the Hearing Officer determined that it arbitrarily imposed the limitation that Dr. Fassett would be M.S.'s mother's sole point of contact for IEP issues.

The Hearing Officer also determined that Dr. Fassett's emails to other IEP team members ridiculing M.S.' mother were inexcusable and the "sort of mean-spirited and unprofessional behavior [that] stands the collaborative nature of [the] IDEA on its head." *Doc. 29-1* at 30.   He correctly observed that "[t]here is no place in the system designed by [the] IDEA for one IEP team member to ridicule a parent to the other team members; the development of an education plan for a child with a disability is not intended to be a mean and nasty process." *Id.*

The Hearing Officer concluded that the arbitrary limit on M.S.'s mother's communication with the IEP team, coupled with the ridiculing emails, "had a chilling effect upon the mother's participation as a full and equal IEP team

47

member." *Doc. 29-1* at 30.   While acknowledging that M.S.'s mother actively

participated in IEP team meetings along with both an advocate and an attorney, the

Hearing Officer determined that the limitation "caused serious trust issues between

[M.S.]'s parents and the school district." *Doc. 29-1* at 31.

The Hearing Officer concluded that these trust issues caused M.S.'s mother to

terminate the School District's social work services for M.S.:

> The issues involving trust surfaced dramatically near the
> end of the school year when the student's mother clearly
> overreacted to the actions of Respondent's social worker who
> was providing the related service of counseling to the student.
> The mother's cancellation of social work services of the student
> as a result of a fear that the social worker was trying to trap the
> student into going to an inappropriate website on a computer
> might seem almost paranoid in isolation, but in view of the trust
> issues directly caused by the actions of Respondent's special
> education director, the mom's overreaction seems much less
> crazy and perhaps almost understandable.   Cancellation of the
> social worker services by the parent was the direct result of the
> trust issues caused by Respondent which impaired the student's
> mother's meaningful participation in the student's educational
> process.

*Doc. 29-1* at 31.

The Hearing Officer concluded that, until near the end of the school year, the

School District did a good job addressing M.S.' s behaviors.   Toward the end of the

school year, however, M.S.'s behaviors impeded his learning and needed to be

address, and at that time, M.S. would have benefited from the counseling of the

School District's social worker.   But as a result of the trusts issues, M.S.'s mother terminated those counseling services.

Concluding that the School District's impairment of M.S.'s mother's right to participate in the education process was a substantive violation of the IDEA, the Hearing Officer found that four hours of compensatory education was appropriate because the deprivation "was relatively short and only involved the period of time near the end of the school year." *Doc. 29-1* at 35.   M.S. had been receiving counseling services for thirty minutes every six-day cycle.   While it was not clear exactly how many counseling sessions M.S. missed, the Hearing Officer estimated that M.S. missed four hours with the social worker, and he determined that four hours of compensatory education was sufficient and appropriate to remedy the IDEA violation.   In addition to the four hours of compensatory education, the Hearing Officer ordered that, going forward, the School District treat M.S.'s mother "as a full and important member" of the IEP team. *Doc. 29-1* at 36.   He also ordered that Dr. Fassett stop ridiculing M.S.'s mother, and he ordered that, if the parents abuse their right to participate in the process by, for example, communicating excessively with staff, the School District meet with the parents and provide a warning before imposing reasonable restrictions.

## B.  Discussion.

The parents contend that M.S. is entitled to compensatory education for the entire 2011-2012 school year, and, as a result, they are seeking a total of 900 hours of compensatory education.[7]   After considering the administrative record, we agree with the Hearing Officer's findings of facts.   Based on those findings, we conclude, as did the Hearing Officer, that the parents are not entitled to any more than four hours of compensatory education.[8]

The parents suggest that the School District's evaluations of M.S. were not adequate, and, therefore, neither was his IEP.   For the reasons discussed above in connection with the claim regarding in the independent educational evaluation, we agree with the Hearing Officer that the evaluations were adequate.

The parents also suggest that the School District failed to provide sufficient special education services for M.S.   In support of that assertion, they cite the testimony of M.S.'s teachers, but they misrepresent, or at least misconstrue, some of

---

[7]  In accordance with Pennsylvania law, students shall attend public school for 180 days of instruction, which, according to the parents, is equal to 900 hours of instruction for elementary students.

[8]  The School District does not challenge the Hearing Officer's conclusion that they denied M.S. a FAPE near the end of the school year.   Nor does it challenge the award of four hours of compensatory education.   Therefore, we assume that the Hearing Officer's decision in that regard was proper.   The issue we address, as framed by the parents, is whether M.S. was denied a FAPE for the entire year and whether he is entitled to 896 additional hours of compensatory education.

that testimony.   For example, the parents assert that Ms. Grose, the emotional

support teacher, testified that, during the 2011-2012 school year, she made only one

recommendation, which was to change M.S.'s seat in the classroom.   Although Ms.

Grose did testify that she made the recommendation to change M.S.'s seat in the

regular classroom, she did not testify that that was the only recommendation that she

made. *See Doc. 29-2* at 52.   Further, Ms. Grose testified about her work with M.S.

at the beginning and end of each school day. *Id.* at 46-47 & 51-52.

The parents also assert that Ms. Troutman, the learning support teacher, never

went into the M.S.'s regular education classroom due to scheduling conflicts.

Although Ms. Troutman did testify that she did not go into M.S.'s regular education

classroom, she testified that she worked closely with Ms. Grose to implement M.S.'s

IEP, that she discussed issues with Ms. Woodling two to three times a week, that she

relied on feedback from the instructional assistants as well as Ms. Woodling, that

she made suggestions to the instructional assistant, and that she made changes to

how M.S. was taught, and tested in, Math. *Id.* at 40-43 & 45.

Intimating that the School District should have had M.S. spend more time

with instructional assistants, the parents assert that Ms. Woodling, M.S.'s

fourth-grade teacher, testified that M.S. never had behaviors of concern when

51

supported by an instructional assistant.   But Ms. Woodling testified as follows

about M.S. behavior while with the instructional assistants:

> Q:   And when you discussed many—you went over a lot
> of these different behavior incidents that occurred during the
> course of the school year.
>         Do you recall any of those behavior incidents
> occurring when [M.S.] was with his instructional assistant?
> **A:   No.**
> . . .
> Q:   Do you recall ever talking to anyone about the fact
> that [M.S.] was successful with his instructional aide for math,
> and that perhaps his time with an instructional aid should be
> increased to address the behavior issues that you were dealing
> with throughout the—on a daily basis at school?
> **A:   We would talk on numerous occasions about the
> instructional assistant[s] and how to best utilize them. . . .**
> Q:   . . . The basic question is that you've testified in quite
> some detail about a quite significant daily list of behavior
> issues—
> **A:   Yes.**
> Q:   —that you were dealing with.   And that when he had
> the instructional aide for math, that you didn't see behavior
> issues.
>         And so my question is: If you recalled discussing that
> with, say, the case manager, the learning support teacher or a
> special education supervisor or the building principal about,
> folks, maybe we need to increase the instructional aide, support
> that we're providing to [M.S.], which could help address the
> behaviors of concern.
> **A:   Yes, the behaviors did improve when the
> instructional aid was—as far as in reference to the other
> students.   There were still some behaviors that were a little
> disrespectful to the aides that were a bit of a problem.**
> **        I did talk to both Ms. Grose and Ms. Troutman and
> Mr. Wetzel about how to best utilize them.   We actually did**

**end up increasing aide time with him.   More emotional
support aides started to come and spend more time with
him.**

Q: And was that successful when they would spend time
with him?

**A:   On some days, yes.**

 . . .

Q: [on redirect examination]   Do you have any idea
whether or not [M.S.] ever complained about the aides or the
paraprofessionals throughout the school day?

**A: Yes.**

. . .

**He often did not like that they were there to help him.
On some occasions, he would be grateful for their help, but
on many occasions he treated them with disrespect, arguing
with them.   And he did not—he disengaged from them on
many occasions as well.**

Q:   Do you know whether or not his mother ever asked
anyone at the district to stop the assistance from the
paraprofessionals that were with him?

**A: At one point, I believe that there was a request to
have the aides pull back.**

*Doc. 29-3* at 31 & 34.

In sum, although the parents suggest that M.S. received few special education

services and supports during the 2011-2012 School year, they failed to convince the

Hearing Officer of that, and they have likewise failed to convince the Court.

The parents contend that the Hearing Officer erred in according Alan

Babcock's testimony and report no weight.   As to this issue, the Hearing Officer

stated:

53

The testimony of Petitioner's expert school psychologist is accorded no weight.   In addition to the factors discussed above, the testimony of said expert is impaired by the fact that he apparently views the role of special education as that of potential maximizing.   Said expert also had a difficult time tying his conclusions to any academic effect upon the student and to the extent that he did draw such conclusions, they were not contained in his written draft report.   More importantly, said expert school psychologist testified that the Respondent's functional behavioral analysis was deficient because it did not identify the function of the student's behaviors.   Petitioner's post hearing brief includes an argument to this effect, claiming that the functional behavioral analysis is fatally flawed as a result.   However, as Respondent's counsel pointed out in cross-examining the witness, said expert drew his conclusions concerning the functional behavioral analysis without ever looking at the report of the functional behavioral analysis. Instead, he relied solely upon a summary of the functional behavioral analysis contained in the Respondent's reevaluation report.   In fact, the functional behavior analysis prepared by Respondent does identify the functions of the student's behaviors.   The FBA identified the functions of the student's inappropriate behaviors as avoiding, escaping or postponing assigned tasks and gaining adult attention in the form of redirection and prompting.   The testimony of Petitioner's expert school psychologist in this regard is highly problematic.   That said witness would draw such a serious conclusion without even looking at the document he is criticizing seriously impairs his credibility and persuasiveness of his testimony.

*Doc. 29-1* at 26-27.   The Hearing Officer did not find Babcock's testimony

credible.   The court must accept credibility determinations made by the Hearing

Officer unless the non-testimonial, extrinsic evidence in the record would justify a

contrary conclusion.   The only non-testimonial, extrinsic evidence that the parents

point to is one page of the functional behavioral assessment, and they assert that the

Hearing Officer failed to recognize that the functional behavioral assessment does

not state a hypothesis for M.S.'s behaviors.   But, in fact, the page of the functional

behavioral assessment cited by the parents sets forth the following two hypotheses

regarding the function of M.S.'s behavior of concern:

> (1) When presented with an academic task demand [M.S.] will
> fail to engage and/or dis-engage from the activity in order to
> avoid, escape and/or postpone the task demand.
> (2) When presented with an academic task demand [M.S.] will
> fail to engage and/or dis-engage from the activity in order to gain
> adult attention in the form of redirection and prompting.

*Doc. 29-4* at 82.   The parents have failed to point to nontestimonial, extrinsic

evidence sufficient to warrant the Court to disagree with the credibility

determination of the Hearing Officer.

Referencing the Hearing Officer's description of Mrs. Stepp as a "handful,"

the parents assert that the Hearing Officer stated that they abused their right to

participate without citing any evidence to support that such abuse occurred.   The

Hearing Officer did not, however, state that the parents abused their right to

participate.   Rather, the Hearing Officer stated that Mrs. Stepp "engaged in a high

volume of communication" with M.S.'s teachers and service providers.   That

statement is supported by the testimony of Ms. Troutman.   In any event, the

Hearing Officer determined that, before the School District limited Mrs. Stepp's

communications with IEP team members, it should have told her that there was a

problem and requested that she reasonably limit her communications or, at least, it

should have warned her before imposing a limitation.   And because it did not do so,

the Hearing Officer concluded that near the end of the school year, the limitation on

Mrs. Stepp's communications with the IEP team, coupled with Dr. Fassett's

ridiculing emails, resulted in a denial of a FAPE to M.S.[9]   The Hearing Officer did

not err in commenting on Mrs. Stepp's communications.

The parents assert that they requested that the School District conduct a

Supplementary Aids and Services Toolkit process, and there is no record of this

occurring during the 2011-2012 school year.   As noted earlier, the parties resolved

the issue of the implementing the Toolkit going forward.   It does not appear that the

parents argued to the Hearing Officer that the failure to conduct the toolkit process

during the 2011-2012 school year resulted in a denial of a FAPE to M.S. *See Doc.*

*29-1* at 58-67 (parents' post-hearing proposed findings of fact and brief).   Nor have

they established in this case that the failure resulted in a denial of a FAPE.

─────────────────────

9   Although we agree with the Hearing Officer that the emails were inappropriate, it
is difficult to see how the emails contributed to a chilling effect on Mrs. Stepp given
that Mrs. Stepp did not view the emails until after the due process complaint was
filed, which was after the 2011-2012 school year (the relevant time period at issue)
ended.

In sum, we agree with the Hearing Officer that the School District did not deny

M.S. a FAPE for the entire 2011-2012 school year, and any denial of a FAPE was

limited to near the end of the school year and resulted from the limitation on Mrs.

Stepp's communications with the IEP team.   Accordingly, we conclude that M.S. is

not entitled to additional compensatory education.[10]


## VI.   Rehabilitation Act.

In addition to their IDEA claims, the parents present a claim under the

Rehabilitation Act in connection with their complaint concerning compensatory

education.

Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified

individual with a disability . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to

discrimination" under any program that receives federal funds. 29 U.S.C. § 794(a).

"Whereas the IDEA provides an affirmative duty to provide education, Section 504

prohibits discrimination against the disabled." *Jana K.* 2014 WL 4092389, at *20.

The Rehabilitation Act's "negative prohibition" against discrimination is similar to the

---

10  The parents do not argue that four hours of compensatory education is not the
appropriate remedy for the limited denial of a FAPE found by the Hearing Officer.

IDEA's "affirmative duty" to provide a FAPE to a disabled student. *Ridley*, 680 F.3d at 280.

Here, the parent's Rehabilitation Act claim appears to be based on the same underlying allegations as their IDEA claim.   As such, it fails for the same reasons. Further, to establish a violation under the Rehabilitation Act, the parents must establish: (1) M.S. was disabled; (2) he was "otherwise qualified" to participate in school activities; (3) the School District received federal financial assistance; and (4) M.S. was excluded from participation in, denied the benefits of, or subject to discrimination by the School District. *Ridley*, 680 F.3d at 280.   The parents, however, have not pointed to evidence in the record that M.S. was excluded from participation in, denied the benefits of, or subject to discrimination by the School District. Accordingly, their Rehabilitation Act claim fails.


## VII.   Attorney's Fees.

The parents also sought attorney's fees in their complaints.   The School District asserts that because the parents were not the prevailing party at the administrative due process proceedings, they cannot recover attorney's fees.   The parents do not address this argument.   Thus, we consider them to have waived any claim to attorney's fees.